FILED
2014 Sep-25  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ORNETTE MURPHY,** | ) | |
| **O/B/O D.L.M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:13-CV-01237-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On June 30, 2010, the claimant's mother, Ornette Murphy, applied for childhood supplemental security income under Title XVI of the Social Security Act on behalf of the claimant, who alleges disability commencing on January 1, 2001, because of hearing voices and suicidal thoughts. (R. 21, 135). The Commissioner denied the claim both initially and on reconsideration. (R. 71-73). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on April 26, 2012. (R. 47).

In a decision dated May 23, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for supplemental security income. (R. 35). On May 3, 2013, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this

court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the ALJ because she failed to apply the proper legal standard in assessing the teacher's evaluations of the claimant's functional limitations and substantial evidence does not support her findings.

## II. ISSUE PRESENTED

Whether the ALJ applied the proper legal standard in assessing the weight he gave to the claimant's teachers, who are considered acceptable sources that the ALJ can consider in determining the severity of her limitations, and whether substantial evidence supports the weight she afforded the opinions of Ms. Glover and Mr. Clark, the claimant's teachers.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the finding.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The Social Security Administration has established a three-step sequential evaluation process to determine if an individual under the age of 18 is disabled. 20 C.F.R. § 416.924(a). At step one, the ALJ must determine if the child is engaged in substantial gainful activity. If the child is not engaged in substantial gainful activity, the ALJ the determines whether the child suffers from a severe impairment or combination of impairments that cause more than minimal functional limitations. *Id*. at § 416.924(a) & (c). If the child suffers from a severe impairment or

3

combination of impairments that has lasted or is expected to continue for a continuous period of at least 12 months, then the ALJ must determine whether the child's impairments meet, medically equal, or functionally equal an impairment listened under Appendix I to Subpart P of Part 404. *Id.* at § 416.924(a).

Functional equivalence is dependent on the child's impairments or combination of impairments resulting in marked limitations in two broad categories of functioning or extreme limitation in one broad category of functioning. 20 C.F.R. § 416.926a(a). A "marked" limitation is one that is "more than moderate" but "less than extreme." *Id.* At 416.926a(e)(2)(I). The Regulations list six broad areas of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *Id.* at § 416.926a(b)(1)(i-vi).

For attending and completing tasks, the ALJ should consider the child's "ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance." *Id*. at § 416.926a(h)(1)(i)-(ii).  As part of determining the child's ability to attend and complete tasks, the ALJ should consider whether the child is "unduly distracted by [her] peers or unduly distracting to them in a school or work setting."  *Id*.  The ALJ should determine the frequency at which the child interrupts others.  *Id*. at § 416.926a(h)(3)(iii).

For the domain of "caring for yourself," the ALJ should consider a child's ability to show "consistent judgment about the consequences of caring for [herself]," and a child's ability to employ "effective coping strategies . . . to identify and regulate [her] feelings, thoughts, urges, and intentions."  *Id*. § 416.926a(k)(1)(i)-(iv).  In determining whether the child has a marked

4

limitation in this domain, the ALJ should consider whether she follows safety rules; whether she responds to her "circumstances in safe and appropriate ways"; and whether she makes "decisions that do not endanger [herself] . . . ." *Id*. The ALJ should determine if her impairment results in the claimant "engag[ing] in self-injurious behavior (e.g., suicidal thoughts or actions . . .), or ignor[ing] safety rules." Id. § 416.926a(k)(3)(iv).

The Social Security Regulations provide that an ALJ may consider evidence from sources other than acceptable medical sources "to show the severity of [an impairment and] . . . how [the claimant] typically function[s]." 20 C.F.R. § 416.913(d). The Regulations list "Educational personnel" as an acceptable source for the ALJ to consider in determining the severity of a claimant's impairments. *Id*. The ALJ must fully explain the weight she affords to these "other sources." SSR 06-03p. The ALJ's reasons for the weight she gives must "ensure that the discussion of the evidence in the . . . decision allows a . . . subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." *Id*.

The ALJ must explain the reasons for the weight she gives each item of evidence so the reviewing court can determine whether her "ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Coward v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). "'Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [she] has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."'" *Id*. (citations omitted).

Although the ALJ does not have to discuss every document in the record separately, "an ALJ may not select only the evidence that favors her ultimate conclusion." *Garfield v.*

5

*Schweiker*, 732 F. 2d 605, 609 (7th Cir. 1984).

## V. FACTS

The claimant was thirteen years old at the time of the administrative hearing and was in the seventh grade. (R. 54). The claimant alleges disability beginning January 1, 2001, because of hearing voices and suicidal thoughts. (R. 135).

*Mental Limitations*

The claimant's primary physician at Marks Village Health Center referred the claimant to Children's Behavioral Health for a psychological evaluation on June 29, 2010. Dr. Vinita Yalamanchili, a psychiatrist at Children's Behavioral, evaluated the claimant.  Dr. Yalamanchili indicated that the claimant reportedly missed appointments with the claimant's psychiatrist because of financial difficulties. The claimant told Dr. Yalamanchili that the claimant heard a male's voice, believed to be the devil, in her head for about a year telling the claimant to kill herself, but only recently told her mother. The claimant's mother told Dr. Yalamanchili that the claimant pulled her own hair out, and reported that the claimant was previously sexually abused, which the claimant denied.  After hearing the claimant's psychiatric problems, Dr. Yalamanchili admitted the claimant to Children's Hospital of Alabama for further psychiatric evaluation.  (R. 230-34).

Dr. Tolulope Aduroja, a psychiatrist at Children's Hospital of Alabama, performed a psychological evaluation on the claimant on July 7, 2010, at the request of Dr. Yalamanchili. Her evaluation revealed that the claimant's gross and fine motor coordination were within normal limits.  Dr. Aduroja performed the Wechsler Abbreviated Scale of Intelligence on the claimant, showing that the claimant achieved a full-scale IQ score of 68, classified as extremely low. The

6

results of the psychiatric evaluation revealed that the claimant's current estimated intellectual abilities fall within the mild range of mental retardation. Dr. Aduroja, relying on the claimant's achievement test, indicated that the claimant's academic skills of a first or second grader were significantly lower than the claimant's same-age peers. The claimant's personality assessment revealed significant anxiety on both objective and subjective measures, including nightmares; excessive worry at school; general anxiety; fear of the behavior of others; and fear of illness/body integrity. Additionally, the psychiatric evaluation showed the claimant had a Global Assessment of Functioning score of 55, and that the claimant suffered from significant cognitive disorganization caused by the claimant's poor perception of reality, as evidenced by auditory and visual hallucinations. Dr. Aduroja discharged the claimant on July 7, 2010, diagnosing the claimant with psychotic disorder, not otherwise specified, and prescribed the claimant Risperdal and Cogentin.( R. 234-37).

On July 20, 2010, the claimant's mother, Ornetta Murphy, completed a function report for children ranging from 6 years old to 12 years old. The claimant's mother indicated that the claimant could not repeat stories she had heard, but could communicate with family and friends. While Ms. Murphy noted that the claimant's impairments affected her behavior around other people in playing sports, her mother indicated that the claimant had friends her own age; could make new friends; and could generally get along with adults and teachers. Additionally, Ms. Murphy noted that the claimant's impairments do not affect her abilities to cooperate with others, take care of herself, or pay attention. (R. 120-30).

On July 27, 2010, the claimant visited Children's Health System for a follow-up with Stephen Pannel, DO and Dr. Nasima Amin, the attending psychiatrist. Dr. Pennel performed a

Child and Adolescent Intake Evaluation, after the claimant complained of being "scared and worried." Dr. Pennel noted that the claimant's mood was anxious, with no visual or auditory hallucinations since her hospitalization. Additionally, Dr. Pennel found that the claimant did not experience any suicidal plans, and that her judgment and thoughts were intact.  Dr. Pennel reported that the claimant was "doing better" and that her "psychosis is resolved."  (R. 244).  He indicated that the claimant had no acute safety issues and that her condition could be managed on an outpatient basis.  Dr. Pennel and Dr. Amin increased her Risperdal from .5 mg to .75 mg per dose to help with her nightmares and sleep problems.  He also noted that the claimant's mother reported that DHR had been involved with their family following sexual abuse of the claimant by her maternal uncle. (R. 241-44).

On August 24, 2010, the claimant followed-up with Dr. Pennel and Dr. Amir at Children's Health System. They noted that the claimant was "mildly better" since her discharge from Children's Hospital in July 2010; that she continued to be somewhat anxious; that she was sleeping better; that her headaches had improved; and that she was happy and smiling at the visit. They instructed the claimant to continue taking her Risperdal and Cogentin and to follow up in four weeks. (R. 240).

The claimant sought treatment at the Emergency Room at Children's Hospital for chest pains on September 25, 2010.  The notes from the visit indicate that the claimant was taking .5 mg of Risperdal and .5 mg of Benztropine Mesylate.   (R. 281-284).

On October 6, 2010, Dr. Arnold Mindingall, a psychologist, at the request of the Disability Determination Service, assessed the claimant's ability to function on a day-to-day basis using a Childhood Disability Evaluation Form.  In assessing the claimant's ability to

8

function in the six functional domains, Dr. Mindingall found the claimant to have "less than marked" limitations for acquiring and using information; attending and completing tasks; interacting and relating with others; and caring for herself.  In making this finding, Dr. Mindingall acknowledged that the claimant has difficultly reading and understanding stories in books or magazines; cannot write longhand; had As, Bs, and Cs on her fifth grade report card; requires a reminder to finish her homework or chores; does not play a team sport; has trouble repeating messages from third parties; has to be told more than once to do something; pulls her hair out; feels that something bad may happen; is scared of loud noises and insects; and was hearing voices telling her to kill herself before she started taking her psychotropic medications. Furthermore, Dr. Mindingall noted that the claimant had no limitations in moving about and manipulating objects because no party reported the child as having any such problems.  Dr. Mindingall failed to put a mark by the degree of limitation in the health and physical well-being domain and left his assessment of that domain blank.  (R. 246-249).

Dr. Mindingall indicated that the claimant was doing much better on her psychotropic medications; that her sleeping problem and headaches had improved; that she had no evidence of auditory or visual hallucinations during her August 24, 2010 evaluation; that she was not in special education classes; and that her activities of daily living did not indicate major issues.  He concluded that, although the claimant "does have a MDI that could produce some of the alleged symptoms and functional limitations, the alleged severity at this point is not totally consistent with the objective evidence on file and does not meet or equal a listing."  (R. 251-252).

Medical records from the Children's Health Systems indicate that the claimant began taking 5 mg of Lexapro daily on January 25, 2011, although the record contains no treatment

notes from any doctor on that date.  (R. 278).

The claimant visited a physician at Marks Village Health Center on June 21, 2011.[1] The claimant's mother told the physician that the claimant pulls her own hair out because of anxiety, even though she had taken 5 mg of Lexapro for the past four to five months.  The physician noted the claimant's "thinning of hair."  The physician referred the claimant to Children's Behavioral Health because of her bizarre behavior. (R. 256).  The record does not contain any medical records from Children's Behavioral Health for the remainder of 2011.

On January 10, 2012, the claimant was rushed to Children's Hospital's Emergency Room, after the claimant's mother called Children's Behavioral Health concerned about the claimant's "bizarre behavior." According to the claimant's mother, the claimant woke up in the middle of the night for the past week complaining of intermittent swelling of the back, shoulders, and hands.  The nurse also indicated that the claimant presented with depression.  The records indicated that the claimant was taking Lexapro at that time, but did not mention Risperidal or any other medications.  (R. 265).

While in the emergency room, the claimant told the nurse that she did not have any suicidal or homicidal ideation, but that she has auditory and visual hallucinations telling the claimant to kill herself. The nurse reported that the "patient has had a recent suicide attempt or gesture or caregiver is concerned this may happen."  (R. 265).  The nurse's notes showed that she instructed the claimant's mother to not leave the claimant alone in the room. (R. 269)

The emergency room's past medical history for this visit  indicated that the claimant was currently receiving psychiatric therapy at UAB every three months and that her next appointment

---

[1] The name of the physician is illegible in the record.

was in mid-February.  Additionally, Dr. Christopher Pruitt, the attending doctor, examined the claimant and ordered  x-rays on her back, chest, and neck, with all three indicating no abnormalities in any of the areas. When discharged from the emergency room, Dr. Pruitt told the claimant to take Motrin every six hours if pain persisted, and to seek medical attention if the claimant became ill.  (R. 265-271).

On February 7, 2012, the claimant returned to Dr. Pannel and Dr. Yalamanchili at Children's Behavioral Health reporting that the auditory hallucinations had returned since December 2011.  The claimant denied having a current desire or plan to harm herself, but the treatment notes indicate that she "continue[d] to be vague about ability to maintain her safety." (R. 280).  The treatment notes state that "[i]n the past, [the claimant] attempted to hang herself" using a "jump rope due to voices telling her to hurt herself."  The notes describe that the claimant "[t]ied a rope around door knob & her neck & just sat on the floor." (R. 280).

The treatment notes also  indicate that, at the time of the February 7, 2012 visit, the claimant was taking 5 mg of Lexapro daily.  Dr. Yalamanchili added a prescription for .5 mg of Risperdal for the claimant's psychosis; ordered her to continue on the Lexapro; and scheduled a follow-up appointment in one week.  The doctors also discussed a standard safety plan with the claimant's mother to monitor the claimant and keep her safe.  (R. 280).

The claimant returned to Dr. Pannel and Dr. Yalamanchili on February 14, 2012 for a follow-up examination. The progress notes indicate that the claimant's mother lost custody of her and her siblings because she left them home alone, and that DHR had placed them in the custody of Virginia Harris, their maternal aunt.  The claimant reported that the voices in her head were gone and she did not have any further thoughts of hurting herself.  She also indicated that she

11

was eating and sleeping well.  The doctors recommended that she continue taking the Lexapro and Risperdal and that she follow-up with them in four weeks.

*Teachers' Questionnaires*

The record contains questionnaires from six of the claimant's sixth and seventh grade teachers assessing the claimant's limitations.  The rating scale for each of the questionnaires asked the teachers to compare the claimant to the children of the same age without impairments and assess whether the claimant had any problem in the six functional domains: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; medical conditions and physical well-being; and caring for herself.  If the claimant did have a problem, the questionnaire required that the teachers rate the degree of the problem, with the following numerical scale: 1—no problem; 2—a slight problem; 3—an obvious problem; 4—a serious problem; or 5—a very serious problem.  (R. 161-213).

On September 27, 2010, shortly after the start of the school, the claimant's sixth grade social studies and language arts teacher, whose name does not appear on the form, completed a teacher questionnaire regarding the claimant's overall functional capacity.  The teacher noted that the claimant had no problems in all six functional domains; that the claimant functioned at the sixth grade level; and that the claimant was an independent learner. Furthermore, the teacher noted that the claimant is pleasant, got along with others, and was well-liked by her classmates and teachers. (R. 161-68).

Ms. Yielding, who is also listed as the claimant's sixth grade social studies and language arts teacher at Whatley K-8 School, indicated on her form, dated March 3, 2011, that she knew

12

the claimant for eight months.[2] In that questionnaire, in the "Acquiring and Using Information"

domain, Ms. Yielding rated the claimant's ability in the following areas as a 3, indicating an

"obvious problem": ability to understand and do math problems; ability to express ideas in

written form; ability to recall and apply learned material; and ability to apply problem-solving

skills in class discussions.  She noted that the claimant "lacks motivation and has to be often

monitored for class assignments"'; that the claimant "has difficulty staying on task in small group

instruction as she [is] often playing/talking or disturbing peers"; and that she will apply herself

when re-directed.  (R. 200).

    In the "Attending and Completing Tasks" domain, Ms. Yielding indicated that the

claimant has an "obvious problem" every day in refocusing to task when necessary; carrying out

multi-step instructions; completing class/homework assignments; working without distracting

self or others; and working at a reasonable pace/finishing on time.  (R. 201).

    She also noted in the "Interacting and Relating With Others" domain that the claimant has

an "obvious problem" in making and keeping friends; seeking attention appropriately;

introducing and maintaining relevant and appropriate topics of conversation.  Ms. Yielding

commented that the claimant responds well to teacher/student talks and that she participates in

small group counseling for academics and behavior.  (R. 202).

    Ms. Yielding noted that the claimant did not have problems in the "Moving About and

Manipulating Objects" or "Caring for Himself or Herself" domains.  (R. 203-204).

---

[2]  The court is unclear if Ms. Yielding also completed the September 27, 2010
questionnaire or if the claimant had a different social studies and language arts teacher at the
beginning of her sixth grade year.  If Ms. Yielding did author both questionnaires, her answers to
the questions could have changed as she spent more time observing the claimant.

On April 11, 2011, Ms. Glover, the claimant's sixth grade reading teacher at Whatley, completed a functional capacity assessment questionnaire for the claimant. Ms. Glover indicated that she knew the claimant from August 1999 to March 2011, and that she saw the claimant for 90 minutes each day.  Ms. Glover noted that the claimant had "obvious problems" in all ten activities related in the "Acquiring and Using Information" domain.  (R. 207-208).

Ms. Glover indicated  that, in the "Attending and Completing Tasks" domain, the claimant has "serious problems" carrying out single-step instructions; organizing her own things or school materials; completing class/homework assignments; completing work accurately without careless mistakes; working without distracting herself or others; and working at reasonable pace/finishing on time.  Additionally, Ms. Glover assessed that the claimant has "obvious problems" in paying attention when spoken to directly; sustaining attention during activities; focusing long enough to finish assignments or tasks; refocusing tasks when necessary; and carrying out multi-step instructions.  (R. 209).

In the "Interacting and Relating With Others" domain, Ms. Glover identified that the claimant has "serious problems" playing cooperatively with others; making and keeping friends; relating experiences and telling stories; and using adequate vocabulary to express thoughts or ideas in an everyday conversation.  She also noted that, for this domain, the claimant has "obvious problems" following rules; respecting/obeying authority figures; using appropriate language for the situation; introducing and maintaining relevant conversation topics; taking turns in a conversation; and interpreting meaning of facial expressions.  Ms. Glover explained in the comment section that she has to "constantly" re-direct the claimant's attention to do her work and stay on task because she is "fussing with others."  She also indicated that the claimant "needs

14

constant help in [a] small group setting."  (R. 210).

In the "Caring for Himself or Herself" domain, Ms. Glover noted "obvious problems" in the claimant's ability to handle frustration appropriately; to be patient when necessary; to calm herself; and to cope with daily demands in the school environment.  (R. 212).  She found that the claimant had no limitations in the "Moving About and Manipulating Objections" domain.  (R. 211).

On February 24, 2012, three of the claimant's teachers completed questionnaires measuring the claimant's functional capacity:  Ms. Young, the claimant's seventh grade home room and science teacher; Mr. Clark, claimant's seventh grade pre-algebra teacher; and Ms. Hale, claimant's seventh grade language and reading teacher.

Ms. Young, who had known the claimant for one-and-a-half years, assessed that the claimant rated at the highest level of 5 and had a "very serious problem" on a daily basis refocusing to task when necessary in the "Attending and Completing Tasks" domain.  She also indicated that the claimant had an "obvious problem" in that same domain completing work accurately without careless mistakes and working at a reasonable pace.  (R. 172).  In the comment section, Ms. Young described the claimant as a bright child, but indicated that she becomes de-focused and that she has to "put her back on track."  She commented that "[i]t is as if her mind wonders away from her."  (R. 171).

In the "Interacting and Relating With Others" domain, Ms. Young reported that the claimant demonstrated an "obvious problem" in appropriately expressing anger and obeying adults in authority. She also indicated that the claimant had an "obvious problem" in the "Caring for Himself or Herself" domain in handling frustration appropriately and responding

appropriately to changes in her own mood.  However, Ms. Young found that the claimant had no problems in the "Moving About and Manipulating Objects" domain.  (R. 173-174).

Mr. Clark, who had known the claimant for seven months, reported that the claimant had "serious problems" related to the "Acquiring and Using Information" domain, specifically in comprehending and doing math problems; understanding and participating in class discussions; and applying problem solving skills in class discussions. He also indicated that the claimant had a "obvious problem" in that same domain understanding school and content vocabulary; reading and comprehending written material; learning new material; and recalling and applying previously learned material.  He wrote in the comment section that the claimant "needs help recalling information."  (R. 179-180).

In the "Attending and Completing Tasks" domain, Mr. Clark noted that the claimant had a "serious problem" daily in working at a reasonable pace and finishing assignments on time. He also indicated that the claimant had a "obvious problem" daily focusing long enough to complete tasks; refocusing on the tasks; carrying out multi-step instructions; completing assignments; and distracting others. (R. 181).

Additionally, Mr. Clark noted that, in the "Interacting and Relating With Others" domain, the claimant showed "obvious problems" daily in maintaining appropriate conversations, taking turns in conversations, and using adequate vocabulary in expressing thoughts.  (R. 182).

He indicated that the claimant had "serious problems" in the "Caring for Himself or Herself" domain with calming herself and using appropriate coping skills in a school environment.  He also noted daily "obvious problems" that the claimant has in that domain handling frustration and in exercising patience.  (R. 184).

16

Ms. Hale, who had known the claimant for one school year and who saw her three times each week, assessed that the claimant had "serious problems" in the following areas: completing work accurately without careless mistakes in the "Attending and Completing Tasks" domain; and respecting and obeying adults in authority and using adequate vocabulary to express thoughts and ideas in the "Interacting and Relating With Others" domain." (R. 190-191). Ms. Hale indicated that the claimant had "obvious problems" in some areas in every domain except "Moving About and Manipulating Objects," including problems in comprehending and doing math problems; understanding and participating in class discussions; applying problem-solving skills in class discussions; carrying out multi-step instructions; changing activities without distraction; completing assignments; and interpreting the meanings of facial expressions, body language, hints, and sarcasm. (R. 189-193).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ on April 26, 2012. (R. 21). The claimant testified that she is not in any special education classes. (R. 52). She indicated that she sometimes gets an attitude with her teachers because they tell the claimant to do something that she does not want to do. (R. 59-60). She stated that she gets distracted in school and distracts her classmates because school bores her. She indicated that her grades are "kind of good" in school. When the ALJ asked the claimant what she meant by "kind of good," she replied "Two Ds and one F." The claimant testified that she needs help in reading, language arts, and math, and that she has asked for tutors for those subjects. She stated that she had received an F nine times because she forgot to do her homework. (R. 62-64).

The claimant stated that she had three best friends, Tiann, Keira, and Tatiana, who are all in the same class as her.  She stated she never spends the night with them, but does go to Kiera's house after school sometimes, but could not remember the last time. She also stated that she has a boyfriend, who is in the same class with her, but that she does not see him away from school. (R. 53-55).

The claimant's mother also testified at the hearing and indicated that the claimant has an attitude problem, especially regarding completing chores around the house. (R. 66-68). The claimant stated that she does make her bed each morning and puts her dirty clothes in the laundry chute.  However, she testified that she does not hang up her clothes; does not help her mom with laundry when asked because she does not want to help; never takes out the garbage; sometimes helps do the dishes after dinner but could not remember the last time; does not help with vacuuming or sweeping the floor because she does not like to do it.  (R. 56-58).

The claimant indicated that her favorite TV show is Lifetime, and that she has more than 500 friends on Facebook. When the ALJ asked her how she knows all these people, she replied "Talk on Facebook."  She stated that she sometimes gets in trouble for using too many minutes on her cell phone.  However, the claimant testified that she never gets in trouble for texting in class. (R. 58-59).

She stated that her attitude gets her in trouble at home with her mom, and that she does not get along with her brother. The claimant testified that when she argues with her brother, the claimant will physically hit him when the brother takes her belongings.  (R. 61-62).

When asked about her medications, the claimant stated that she was currently taking medications, but did not know which ones.  She said she takes her medication every morning but

18

not every night and keeps her medication by the sink in the kitchen.  (R. 60-61).

The clamant testified that she wants to be a preacher when she grows up; does not go to church every week on Sundays; does not belong to any church group; and sang one time in a choir.  (R. 64).

The ALJ did not ask the claimant any questions regarding her hallucinations or past suicide attempts.  However, she did ask the claimant "Do you have a secret friend?"  The claimant stated that she did not have a secret friend.  (R. 65).

The claimant's mother also testified about the claimant's hallucinations.  She stated that the claimant kept hearing voices telling her to kill herself, which led the claimant's mother to take her to the hospital. She testified that the claimant "drew a picture of a little girl hanging, having a rope around her neck hanging herself. She said it was her. That's what she wanted to do to herself."  (R. 66).

The claimant's mother indicated that the claimant has no eyelashes because she pulls them out.  She noted that the claimant would wake up in the middle of the night pulling her hair out by the roots, and that the claimant is scared to sleep by herself with voices coming from the claimant's closest. (R. 66).  She stated that she took the claimant to the doctor when she was growing up because she would "pull her hair all the way out to the roots," and the doctors would give her a special shampoo to put on her hair.  However, her mom stated that she knew something else was wrong with the claimant and attributed her hair pulling behavior to the claimant's nervous condition.  (R. 68).

The claimant's mother testified that she received phone calls every day from the school with the claimant wanting to leave school early. She stated that the claimant believed her face

19

was swollen with pain in her body. She noted that she took the claimant to the emergency room for these problems, but the hospital did not find anything consistent with the claimant's allegations. The claimant's mother testified that she has a nervous condition, just like the claimant suffers from, and could be the reason of the claimant's weird symptoms.  (R. 67-68).

She indicated that the claimant currently took medications, but the claimant did not usually take her medications at night like she was suppose to do.  She indicated that she reminds the claimant to take her nightly medication "when I'm able to remember because I have to take medicine also.  A lot of times, I just be, I just be tired."  (R. 68-69).

*The ALJ's Decision*

On May 23, 2012, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. The ALJ found that under the three-part analysis for determining child disability status, the claimant had not engaged in substantial gainful activity since June 30, 2010. The ALJ also found that the claimant suffered from the severe impairment of schizophrenia. However, she concluded that the claimant did not have an impairment or combination of impairments that meets or medically equals a listing. (R. 21-24).

The ALJ found that she did not meet Listing 112.03 for schizophrenia.  Specifically, she found that the claimant had "not exhibited any [marked] limitations in her thinking, feeling or behavior, nor . . . any such deterioration from a previous level of functioning or failure to achieve the expected level of social functioning."  As such, the ALJ concluded that the claimant's schizophrenia did not meet or medically equal a listing under § 112.03.   (R. 24).

Next, the ALJ addressed whether the claimant's impairment functionally equaled a listing.  She applied the pain standard in assessing whether to discredit the claimant's subjective

testimony of her symptoms, and determined that the claimant did have the severe impairment of schizophrenia that could produce the claimant's symptoms.  In considering the claimant's schizophrenia, the ALJ noted the following facts: the claimant began making allegations of auditory hallucinations in 2010; testing indicated that the claimant had significant anxiety on both objective and subjective measures; the claimant reported "nightmares, excessive worry at school, general anxiety, fear of the behavior of others, and fear of illness and body integrity"; and the claimant's "reality testing was poor and auditory and visual hallucinations were evidence for significant cognitive distortion."   The ALJ indicated that "these symptoms were consistent with the claimant's mental health issues."  (R. 25).

The ALJ noted that "in a recent examination, the claimant admitted that she had not received any previous psychiatric treatment," citing her June 2010 hospitalization records; that, in those records, the claimant described that she was "hearing voices of a male inside her head for about a year" telling her to kill herself, and that she thought the voice was that of the devil; that she indicated that she "had not obeyed the command, but that she was worried"; that the claimant's mother reported that the claimant had been pulling out her hair and that the claimant had been sexually abused, although the claimant denies that she was abused; that her mother noted that the claimant drew pictures of a girl hanging herself; and that the mother indicated that the claimant "often pulled out her hair, pulled out her eyelashes, and had nightmares regularly." The ALJ concluded that this evidence showed that the claimant did have "ongoing mental health issues consistent with her alleged psychotic disorder."  (R. 25).

However, the ALJ found that the intensity, persistence, and limiting effects of the claimant's symptoms are not credible "to the extent they are inconsistent with the finding that the

claimant does not have an impairment or combination of impairments that functionally equals the listing. . . ."  (R. 27).  As support for this finding, the ALJ noted that "although the claimant has alleged a long history of psychotic issues, she has given only very vague descriptions of these hallucinations; that she has good grades and performed well in school despite her mental illness; that she has sought "very minimal treatment" for her mental health issues; that not one teacher mentioned her hallucinations or psychotic disorder in their questionnaires; and that treatment notes indicated that the claimant "did better when in counseling and taking her medications regularly."  The ALJ also noted the claimant's GAF score of 55; her lack of seeking consistent treatment for her schizophrenia; and her ability to retain the ability to function in daily life despite her mental illness.  She stated that "the claimant's schizophrenia has not barred her from participating in most average day-to-day activities."  The ALJ concluded that these findings show that the claimant did not have any "ongoing issues relative to her mental health disorder that impacted her so significantly as to result in a disabling condition."  (R. 26).

In assessing the weight to give the opinions in the record, the ALJ gave "little weight" to Dr. Mindingall's childhood disability assessment of the claimant indicating that she had less than marked limitations in acquiring and using information, maintaining attention and concentration, self care, interacting and relating with others, moving about and manipulating objects, and health and physical well-being. The ALJ explained that Dr. Mindingall's opinion was  an "opinion of a non-examining psychologist," and was not consistent with or supported by the record as a whole.  Furthermore, the ALJ indicated that Dr. Mindingall's opinion was not consistent with the claimant's testimony, as her testimony did not revealed any social interaction limitations, nor limitations to move or manipulate objects. (R. 27).

The ALJ gave "significant weight" to the claimant's unnamed social studies teacher, Ms. Young, Ms. Hale, and Ms. Yielding's opinions regarding the claimant's functional limitations. The ALJ explained that she gave them "significant weight" because all four of these individuals, as teachers, underwent "special training and has extensive experience working with children that have limitations, both physical and mental."  She also articulated that, although these four teachers were not considered acceptable medical sources, they had the opportunity to see the claimant on a regular basis and observe her in the classroom.

However, the ALJ gave "little weight" to Mr. Clark's and "no weight" to Ms. Glover's opinions regarding their assessment of the claimant's ability to function in the six domains.  The ALJ did acknowledge that both Mr. Clark and Ms. Glover had ongoing interactions with the claimant, but stated that they were not considered acceptable medical sources.  She also stated that their opinions contrasted with the four other teachers' assessments. (R. 27-29).

The ALJ discussed all six domains of limitations and found that the claimant had less than marked limitations in the domains of "Attending and Completing Tasks" and "Health and Physical Well-Being" and no limitations in the remaining four domains.  (R. 30-35).

In finding that the claimant had less than marked limitations in the "Attending and Completing Task" domain, the ALJ noted that the claimant made her bed every morning; hung up her clothes; put dirty clothes in the hamper; received failing grades nine times because the claimant forgot to turn in her homework assignments; and had an "attitude" about doing things when asked by teachers.  She noted Ms. Young's questionnaire that indicated that the claimant had a "slight problem" in comprehending oral instructions, reading and comprehending written material, expressing ideas in writing, and applying problem solving skills in class discussions.

23

The ALJ also stated that "Ms.Young also noted that the claimant as a 'very bright child.'. . . However, she also noted that the claimant could become 'defocused' and required focusing to tasks. . . ." (R. 32). Additionally, the ALJ cited Ms. Hale's assessment that the claimant had obvious problems in comprehending and doing math problems, understanding and participating in class discussions, applying problem solving skills in the classroom; carrying out multi-step instructions; changing from one activity to another; completing class and homework assignments; and interpreting the meaning of facial expressions, body language hints, and sarcasm. The ALJ concluded that, "although the claimant did exhibit some limitations to attending and completing tasks, [the claimant] . . . had less than marked limitations in this area as she had retained ability to perform most tasks in spite of her impairment." (R. 32)

In the health and physical well-being domain, the ALJ found that, while the claimant has a psychotic disorder, the claimant demonstrates good health with normal hearing and vision. (R. 31, 35). She, therefore, found that the claimant had less than marked restrictions in this domain.

In discussing the other four domains, the ALJ found that the claimant had no limitations in "Acquiring and Using Information" because she did not attend special educational classes; was able to go to the store and library; could  use the computer; could ride the bus; could comprehend and express simple and complex ideas; could read; could spell most words; could write a simple story; and could add and subtract numbers over ten. (R. 30).

The ALJ concluded that the claimant had no limitation in the "Interacting and Relating With Others" domain because she is very social demonstrated through having three best friends, 500 friends on Facebook, and a boyfriend, although she did not see the boyfriend outside of school.   The ALJ, citing the hearing testimony, noted that the claimant "stated that she enjoyed

24

going to church and used to sing in the church choir."  (R. 32). She also noted that the claimant has a cell phone, and "often got in trouble for texting during class and going over her minutes." (R. 32).  Additionally, the ALJ referenced the social studies teacher's functional capacity assessment that stated she was a "pleasant child with a pleasing attitude that gets along well with others." (R. 32-33).

In the "Moving About and Manipulating Objects" domain, the ALJ, citing the hearing testimony, found that "the claimant noted no issues with performing normal daily activities such as walking, riding a bike, using the bus, participating in gym class, or with writing or typing." (R. 33).  The ALJ also pointed to the claimant's social studies teacher's functional capacity assessment that stated that she "had no problems in moving her body from one place to another. . . ." (R. 33).

The ALJ found that the claimant has no limitation in "Caring for Yourself" domain, explaining that the claimant has not shown any limitations making healthy food choices. The ALJ also noted that she "has not exhibited any problems such as body rocking[,] head banging, self-mutilation, suicidal ideation, refusal to take medication, thumb sucking, eating disturbances or sleep disturbances." (R. 34).

Because she found that the claimant did not have marked limitations in two domains or an extreme limitation in one domain, the ALJ found that the claimant did not functionally meet Listing 112.03.  As such, the ALJ concluded that, although the claimant's psychotic disorders impacted her ability to function, the claimant was not disabled under § 1614(a)(3)(C) of the Social Security Act.

## VI. DISCUSSION

The claimant argues that the ALJ erred when she gave little or no weight to two of the

teachers' assessments, yet gave the other four teachers' assessments "significant weight" based

on the same line of reasoning.  The court agrees and finds that the ALJ did not apply the proper

legal standard in assessing the teachers' assessments of the claimant's limitations and that

substantial evidence does not support her findings.

The claimant's teachers, from both her sixth and seventh grade years, assessed the

claimant's functional limitations in the six domains.  The ALJ's reasons for giving four of the

teachers "significant weight" were that, although they were not "acceptable medical sources,"

they had "firsthand knowledge of the claimant's functional limitations"; they had the

"opportunity to see the claimant on a regular basis and observe her in the classroom"; and that, as

teachers, they had "undergone special training and . . . [had] extensive experience with working

with children that have limitations, both physical and mental."  (R. 28).  All of these reasons

seem reasonable.  However, they are, in essence, some of the very same reasons that the ALJ

chose to give Mr. Clark and Ms. Glover's opinions little or no weight; they noted that the

claimant had "serious problems" in many of the domains.  As such, the court is perplexed as to

how the ALJ can rely on the same reasons to give "significant weight" to some teachers and little

or no weight to the teachers that did not support her ultimate conclusion.

The ALJ chose to give Mr. Clark and Ms. Glover, who found collectively that the

claimant had "serious problems" in four of the domains, little or no weight because, "although

[they] did have ongoing interactions with the claimant, [they were] not considered an acceptable

medical source."  (R. 28-29).  However, neither were the other four teachers— a fact that

26

apparently did not matter to the ALJ when she gave the unnamed social studies teacher, Ms. Young, Ms. Yielding, and Ms. Hale "significant weight" after acknowledging that they also were not acceptable medical sources. The ALJ also noted that four of the teachers' opinions deserved "significant weight" because, even though they were not acceptable medical sources, they had the opportunity to observe the claimant on a regular basis. Then, the ALJ turns around and admits that Mr. Clark and Ms. Glover also had the same opportunity to observe the claimant on a regular basis, but gives them little to no weight because they were not acceptable medical sources. This circular reasoning makes no sense to the court and cannot serve as substantial evidence for discrediting Mr. Clark and Ms. Glover's assessments.

Moreover, Mr. Clark and Ms. Glover as teachers did not have to be acceptable medical sources for the ALJ to give their opinions "significant weight" in determining the severity of the claimant's functional limitations. As "educational personnel," the ALJ could consider the teachers' opinions to show the severity of the claimant's functional limitations and assess whatever weight to their opinions that she found was supported by the record. *See* 20 C.F.R. § 416.913(d). By suggesting that she could not give Mr. Clark and Ms. Glover's opinions more weight because they were not acceptable medical sources, the ALJ applied an incorrect legal standard. Also, the ALJ's attempt to use this same reasoning to both support and discredit different teachers is not logical and is not supported by substantial evidence.

The ALJ also based her decision to give four of the teachers "significant weight" on the fact that those teachers had special training and experience with working with children like the claimant. The court finds nothing in the record to support the ALJ making this finding as to *some* of the teachers, but not *all* of them. She conveniently notes this special training only for the

27

teachers that support her findings.  The court searched the record for teacher resumes or certificates to support the ALJ's finding, but found nothing.  The court does not know why, as teachers, Mr. Clark, a math teacher, and Ms. Glover, a reading teacher, would not have the same "special training" as the other four teachers, none of whom were special education teachers who might have more training with students with functional limitations.  The court finds that substantial evidence in the record does not support this reason to discredit Mr. Clark and Ms. Glover's opinions.

The ALJ also cited as a reason for discrediting Mr. Clark and Ms. Glover's opinions the fact that their opinions conflicted with the other teachers' opinions.  The court disagrees.  Seemingly, the ALJ picked and chose which teachers she wanted to use to support her decision and gave them "significant weight," but gave little or no weight to Mr. Clark and Ms. Glover, whose assessments of the claimant showed serious problems in four of the domains.  As the court evaluated all of the teachers' opinions, it has seen a general consensus among most of the teachers—that the claimant has "obvious," "serious," or "very serious" problems in the "Attending and Completing Tasks" domain.

Ms. Young, to whose opinion the ALJ gave "significant weight," found that the claimant had a "very serious problem" on a daily basis refocusing to task when necessary.  (R. 172).  In giving Ms. Young's opinion "significant weight," the ALJ failed to mention and attempted to minimize Ms. Youngs' finding of a "very serious problem" in this domain.  As the court read the ALJ's description as to what Ms. Young found, the court initially thought that Ms. Young had found only a slight problem in this area.  The ALJ specifically stated that "However, Ms. Young also noted that the claimant could become 'defocused' and required refocusing to tasks."  Yet, the

ALJ failed to mention anywhere in her opinion that Ms. Young actually found that the claimant had a "very serious problem" *daily* in this domain—the most limiting and serious problem on the rating scale.  Instead, the ALJ picked the portion of Ms. Young's assessment that supported her decision and relied on them but failed to sufficiently explain why the ALJ did not accept Ms. Young's "very serious problem" assessment.

The ALJ's characterization of Ms. Young's assessment regarding her finding of a "very serious problem" refocusing in the "Attending and Completing Tasks" doman is especially disturbing to the court  in light of the other teachers' findings that the claimant had "serious" to "obvious" problems in this same domain. Ms. Hale, to whose opinion the ALJ gave "significant weight," assessed that the claimant had a serious problem in completing work accurately without careless mistakes in this domain.  (R. 190-191).  Ms. Glover found that the claimant had "serious problems" carrying out single-step instructions; organizing her own things or school materials; completing class/homework assignments; completing work accurately without careless mistakes; working without distracting herself or others; and working at reasonable pace/finishing on time. Ms. Glover specifically noted that she has to "constantly" re-direct the claimant's attention to do her work and stay on task because she is "fussing with others."  (R. 207-210).  Mr. Clark assessed that the claimant had a "serious problem" in this domain working at a reasonable pace and finishing assignments on time and an "obvious problem" daily focusing long enough to complete tasks; refocusing on tasks; carrying out multi-step instructions; completing assignments; and distracting others.  (R. 181-184).  Ms. Yielding, to whom the ALJ gave "significant weight," assessed that the claimant had an "obvious problem" daily refocusing to task; carrying out multi-step instructions; completing class/homework assignments; working

29

without distracting others; and working at a reasonable pace.  Ms. Yielding specifically stated that "the claimant lacks motivation and has to be monitored for class assignments" and that she "has difficulty staying on task in small group instruction as she [is] often playing/talking or disturbing peers."  (R. 200).

Four of the six teachers assessed that the claimant has great difficulty in the "Attending and Completing Tasks" domain. The court does not understand how teachers varying in their assessment of the *degree* of the problem in a certain area alone creates a "conflict" between Mr. Clark and Ms. Glover's opinions and the rest of the teachers.  These four teachers all acknowledged that the claimant struggles in this domain, yet the ALJ chose to simply discard Mr. Clark and Ms. Glover's opinions in this domain by merely stating they conflict with the other teachers' opinions.  The ALJ's  reasoning lacks merit.  All of these difficulties the claimant has in this domain are factors the ALJ should have considered in determining whether the claimant has a marked limitation in this domain.  See 20 C.F.R. § 416.926a(h)(1)-(3).  Instead, she picked and chose what supported her decision without providing sufficient explanation for discarding some of the teachers' opinions about the claimant's functional limitations in this domain.

The court is also concerned about the ALJ's findings in the "Caring for Yourself" domain, in which she found that the claimant had no limitations in functioning.  The ALJ specifically stated that the claimant had "not exhibited any problems such as body rocking, head banging, self-mutilation, suicidal ideation, refusal to take medication, thumb sucking, eating disturbances or sleep disturbances."  The ALJ's statement is simply wrong and substantial evidence does not support her findings regarding this domain.  The record contains substantial evidence that the claimant did have suicidal ideations; that she pulled out her eyelashes and

30

pulled out her hair at the roots; and that she suffered from nightmares.

The record contains evidence that the claimant has exhibited suicidal ideations. The claimant's mother testified at the hearing that the claimant "drew a picture of a little girl hanging, having a rope around herself hanging herself"; her mother testified that the claimant said that little girl was her and "that's what she wanted to do to herself." (R. 66). In the January 2012 emergency room records, the nurse reported that the claimant "has had a recent suicide attempt or gesture or caregiver is concerned this may happen." (R. 265). Also, Dr. Pannel and Dr. Yalamanchili's treatment notes from February 7, 2012 reference that the claimant had made a suicide attempt in the past, where the claimant "attempted to hang herself" using "a jump rope due to voices telling her to hurt herself." The notes indicate that the claimant "[t]ied a rope around door knob & her neck & just sat on the floor." (R. 280). Given this evidence, how the ALJ can say that the claimant has *no* limitation in the "Caring for Yourself" domain is baffling.

Moreover, the record supports that the claimant has exhibited self injurious behavior in pulling out her eyelashes and hair at the roots. In June 2010, the claimant was hospitalized for ten days because she reported hearing a male's voice in her head, who she believed to be the devil, telling her to kill herself; at that time, she also reported pulling out her hair. (R. 230-234). Dr. Mindingall also noted that the claimant "is always pulling out her hair" in his October 2010 assessment. (R. 249). In July 2011, the claimant's mother reported to the doctor at Marks Village Health Center that the claimant continued to pull out her own hair, even though she had been on Lexapro for four to five months. The doctor specifically noted at the visit the claimant's "thinning of hair." (R. 256). Moreover, the claimant's mother testified at the hearing that the claimant has no eyelashes because she pulls them out, and that the claimant pulls out her hair at

the roots.  (R. 66-68). Contrary to the ALJ's finding of *no* limitation, the claimant clearly had limitations in this domain because of her inability to control pulling out her eyelashes and hair, even while on medication.

Additionally, despite the ALJ's statement to the contrary, the record contains evidence that the claimant suffered from nightmares and sleeping disturbances.  In June 2010, Dr. Pennel and Dr. Amin increased the claimant's Risperdal from .5 to .75 mg because of the claimant's nightmares and sleep problems.  (R. (244).  Although the psychotropic medications may have helped her sleeping problems, she nevertheless had problems in this area. Also, in January 2012, the claimant reported she woke up in the middle of the night feeling like her back, shoulders, and hands were swelling, evidencing a disturbance in her sleep.  (R. 265).

Not only is the court concerned that the ALJ simply ignored or minimized facts in the record in finding that the claimant had no limitation in the "Caring for Yourself" domain and less than marked restrictions in the  "Attending and Completing Tasks"  domain, the court is also troubled that the ALJ's decision is replete with outright mischaracterizations of the facts in the record.  For example, the ALJ states that the claimant testified at the hearing that she hung up her clothes.  (R. 31).   However, the claimant actually testified that she did *not* hang up her clothes. (R. 56). The ALJ stated that the claimant testified at the hearing that "she enjoyed going to church and used to sing in the church choir."  (R. 32).  The claimant actually testified that she "*sometimes*" goes to church; is *not* part of any church group; and only sang in the choir *one* time The claimant never said anything about "enjoying" going to church.  (R. 64).  The ALJ made it seem as if the claimant went to church and sang in the choir often, which was not her testimony. The ALJ also stated that the claimant testified at the hearing that she "often got in trouble for

32

texting during class." (R. 32). To the contrary, the claimant testified that she *never* texts during class. (R. 59). Moreover, the ALJ stated that the claimant "noted no issues with performing normal daily activities such as . . . riding a bike, using the bus . . . or with tying." (R. 33). Nowhere in the claimant's testimony does she mention a bike, the bus, or tying. The court has no idea where the ALJ retrieved those facts. After reading the ALJ's opinion, the court looked to the table of contents in the record to make sure it had not missed a transcript for a second hearing because the information contained in the ALJ's opinion varied greatly from the information in the hearing transcript before the court.

The court finds that the ALJ applied the improper legal standard in evaluating the teachers' opinions concerning the claimant's functional limitations and that substantial evidence does not support her findings as discussed above. Therefore, this court finds that the ALJ's decision is due to be reversed and remanded. On remand, the court urges the ALJ to explain thoroughly and sufficiently her reasons for discrediting the serious limitations espoused by the teachers in their questionnaires; to accurately depict the evidence in the record; and to update the claimant's medical records to ascertain the current status of the claimant's functioning.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is to be REVERSED and REMANDED because she failed to apply the proper legal standard and substantial evidence does not support her findings.

The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 25th day of September, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE